IN THE SUPREME COURT OF THE STATE OF DELAWARE

PIKE CREEK RECREATIONAL
SERVICES, LLC, a Delaware Limited
Liability Company,

  Plaintiff Below,
  Appellant,

  v.

NEW CASTLE COUNTY, a Political
Subdivision of the State of Delaware,

  Defendant Below,
  Appellee.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

No. 309, 2020

Court Below: Superior Court
of the State of Delaware

C.A. No. N19C-05-238

Submitted: May 26, 2021
Decided: August 5, 2021

Before **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices.

### O R D E R

On this 5th day of August 2021, upon consideration of the parties' briefs, the record on appeal, and the argument of counsel, it appears that:

1. The Plaintiff-Appellant, Pike Creek Recreational Services, LLC ("PCRS"), appeals from an order of the Superior Court granting summary judgment in favor of the Defendant-Appellee, New Castle County (the "County"). The litigation involves a parcel of real property consisting of approximately 179.28 acres in an area of New Castle County known as Pike Creek.[1] The parcel is subject to a set of restrictive

---

[1] Parts of the record also refer to the parcel as containing 173.957 acres. The difference is not material.

covenants originally imposed in 1964 on approximately 1,141 acres, of which the 179.28 acres are a part. Included within the restrictions was a provision that "not more than" 4,500 family dwelling units would be constructed on the 1,141 acres.[2] A 1969 amendment to the restrictions increased the acreage to 1,363.58 acres and the number of dwelling units to "not more than" 5,454.[3] The 1969 amendment also provided that at least 130 acres were set aside for use as an 18-hole golf course. Those 130 acres are part of PCRS's 179.28-acre parcel, which is the last remaining, largely undeveloped part of the 1,363.58 acres. PCRS developed a plan to build 224 dwelling units on the non-golf course portion of its property, which was still within the limit of 5,454 units permitted on the 1,363.58 acres by the restrictive covenants. On November 1, 2018, PCRS submitted an application to the County's Department of Land Use and Planning Board (the "Board") to remove the golf course restriction. Removing the golf course restriction would allow the 130 acres to qualify as community area open space, a necessary component of the plan to build 224 dwelling units. The Board recommended denial of the application. PCRS then filed suit in this case, seeking a declaratory judgment that its proposed 224 dwelling units are permitted under the 5,454 dwelling unit cap contained in the restrictive covenants. It averred that a more restrictive density limit resulting from the

---

[2] App. to Appellant's Op. Br. at A0081 [hereinafter A__].
[3] A0092.

regulations of the County's Unified Development Code ("UDC"), which did not permit 224 units on PCRS's parcel, could not lawfully reduce the 5,454 dwelling units allowed under the restrictive covenants. The Superior Court rejected PCRS's contentions and ruled that any development of PCRS's parcel must be consistent with the UDC. We see no error in the Superior Court's ruling and affirm.

2. In another case involving the same parties and the same 179.28-acre parcel, the Superior Court ruled that the set-aside of 130 acres for use as an 18-hole golf course remained a valid restrictive covenant. The facts we base our decision on are taken from the facts as recited in that case, the Superior Court's decision in this case, and the briefs of the parties in this case.

3. In 1964, four original owners of approximately 1,141 acres in Mill Creek Hundred, now known as Pike Creek Hundred, and also now known as Pike Creek Valley, in New Castle County, entered into an agreement to develop the land pursuant to a comprehensive master plan, applying the principles of a planned unit development. At the time, New Castle County was governed by the Levy Court, and the County's zoning code had not yet evolved to include provisions to accommodate such mixed-use development plans. In order to induce the Levy Court to consider a proposed rezoning of the parcel in light of specific proposed uses, the original owners voluntarily entered into an agreement that imposed restrictions on the subject acreage in the event that the Levy Court approved the owners' petition for rezoning.

3

The agreement provided that the 1,141 acres would be developed in accordance with a plan which would, for example, allocate "areas for public open space, schools, churches, arterial highways, commercial areas and recreational areas."[4] As mentioned, the agreement also provided that "not more than" 4,500 dwelling units would be constructed on the 1,141 acres, subject to the number of family dwelling units being increased if areas set aside for school and church purposes went unclaimed and unused. The original owners also made the Levy Court a third-party beneficiary of the agreement. The Levy Court and its successors were given the power to enforce the agreement, and any amendments to the agreement would require approval by the Levy Court or its successors in interest. The Levy Court was not a party to the agreement and did not sign the agreement. With respect to a golf course, the agreement set aside open space for "a par three golf course or other recreational use."[5] The original owners requested that the area set aside for the par three golf course be zoned commercial, and in return covenanted to use the land for either commercial recreational purposes or non-profit recreational uses only. In December 1964, the Levy Court approved the original owners' development plan as described in the 1964 agreement and master plan and rezoned the subject acreage. As a result, the voluntary restrictive covenants became effective. The 1964

---

[4] A0079.
[5] A0081.

agreement was recorded in the Recorder of Deeds office.

4. In 1969 the original contracting parties executed an amendment to the 1964 agreement. The 1969 amendment had several distinct objectives: (1) to acknowledge New Castle County Council as the Levy Court's successor in interest, and thus the governmental organization with final jurisdiction over the subject acreage; (2) to identify changes in the corporate identities of two of the original owners; and (3) to expand the acreage subject to the restrictive covenants from 1,141 acres to approximately 1,363.58 acres. The amendment also increased the number of permitted family dwelling units to "not more than" 5,454.[6] Another significant feature of the amendment is that it dropped the set-aside for a par three golf course and replaced it with a set-aside of 130 acres for use as an 18-hole golf course. Finally, just as the restrictions in the 1964 agreement were contingent upon the County approving certain rezoning, the 1969 amendment was contingent upon the County approving additional zoning changes. The County approved the requested zoning changes, and the 1969 amendment became effective. The 1964 agreement as amended in 1969 may sometimes be referred to as "the Agreement."

5. An 18-hole golf course was eventually constructed on the designated 130 acres and operated by Three Little Bakers, Inc. until 2008, when PCRS purchased the 179.28 acres, including the 130 acres occupied by the golf course. PCRS shut

---

[6] A0092.

5

down the golf course in 2010.

6. On December 31, 1997, the County adopted a new Unified Development Code ("UDC"). It imposed new zoning and subdivision restrictions across the county. At that time, 89%, or 4,854, of the 5,454 dwelling units permitted under the restrictions had been approved by the County and largely constructed.

7. As previously mentioned, on November 1, 2018, PCRS submitted an application to the Board to remove the golf course restriction and change the 130 acres formerly occupied by the golf course to community area open space to allow construction of 224 dwelling units on the rest of the 179.28 acres. Under the UDC, the area restricted to golf course use did not qualify as community area open space needed to support construction of 224 dwelling units.

8. The Board found that, with the golf course set-aside still in place, PCRS's property contains "approximately 47 developable acres, upon which approximately sixty (60) housing units could be built" consistent with the UDC.[7] The Board recommended that the requested change of the golf course restriction be denied, citing a number of problems with the community area open space plan. This litigation followed.

9. The UDC contains the following Section 40.01.150 regarding prior restrictive covenants:

---

[7] A0120.

6

No prior restrictive covenants that have been entered into in which New Castle County is a beneficiary shall be altered by the provisions of this Chapter. Where such covenants restrict the type of uses under former New Castle County zoning districts, those uses shall remain restricted regardless of the zoning of the district.[8]

In the Superior Court, PCRS argued that the UDC, if applied to its parcel, would alter the following two provisions in the Agreement in violation of Section 1.150:

Paragraph 9 reads as follows:

The DEVELOPER, on its own behalf and on behalf of its successors and assigns, covenants and agrees that not more than 4,500 family dwelling units will be constructed or erected on the SUBJECT ACREAGE known as Pike Creek Valley, subject only to the qualification that the number of family units may be increased in accordance with the provisions of Article 8, if land set aside for school and church purposes is unclaimed and unused.[9]

Paragraph 16 reads as follows:

DEVELOPER covenants and agrees that in the event that provision shall be made in the applicable zoning law for planned unit development districts or similar types of zoning the SUBJECT ACREAGE may be appropriately zoned thereunder, provided that such rezoning would permit DEVELOPERS to accomplish all of the aspects of the preliminary, tentative comprehensive plan and of the updated master plan and would not be more restrictive than the limitations imposed upon DEVELOPER by the terms of this agreement.[10]

---

[8] New Castle Cty. C. § 40.01.150.
[9] A0081.
[10] A0084.

7

PCRS argued that applying the UDC to its parcel would alter Paragraph 9's provision allowing 5,454 family dwelling units. It further argued that the UDC altered Paragraph 16 by imposing regulations that were more restrictive than the terms of the Agreement.

10. The Superior Court first found that Section 1.150 did apply to the restrictive covenants because the restrictions are enforceable by the County and did pre-date the adoption of the UDC. The court then continued its analysis by observing:

> A provision of the UDC would alter the Covenant if application of the UDC would change the meaning of the instrument. Such an alteration is material if it would change the burdens, liabilities, or duties of a party or changes the operation of any of its terms. Thus, Section 1.150 is implicated if the UDC purports to ban what the Covenant grants, or forbid what the Covenant requires..[11]

Applying this approach, the Superior Court found that the UDC does not alter Paragraph 9's restriction that "not more than" 5,454 family dwelling units would be constructed on the original parcel. Specifically, the court found as follows:

> The Covenant creates one set of restrictions on use in the Pike Creek Valley by capping the total number of households permissible in the total subject acreage. The UDC introduces an additional restriction, limiting the density of households independent of that cap. Because both restrictions are solely limitations on household construction, adhering to one cannot possibly interfere

---

[11] *Pike Creek Recreational Servs., LLC v. New Castle Cnty.*, 238 A.3d 208, 215-16 (Del. Super. 2020) (internal citations omitted).

8

> with obedience to the other. Since there is no conflict of obligations, the UDC does not work an alteration. Both sets of restrictions and limitations apply.[12]

In other words, since the restriction in Paragraph 9 provides only that "not more than" 5,454 units would be constructed, it contains no guaranteed minimum number of units. The fact that the UDC only permits construction of approximately 60 housing units on PCRS's parcel does not alter Paragraph 9's limitation that "not more" than 5,454 units would be constructed on the original parcel.

11. The Superior Court also rejected PCRS's contention that UDC provisions, if applied, would alter Paragraph 16. The pertinent part of the Superior Court's opinion and order addressing Paragraph 16 reads as follows:

> Though the final clause uses permissive language to describe when a zoning authority "may" rezone areas of Pike Creek Valley as a planned unit development district, the landowners lacked the authority to bind the zoning authority. As PCRS itself acknowledged in the Prior Action, the Covenant could not possible give the landowners any rights enforceable against the Levy Court or its successors, since Delaware forbids contract zoning. At most, the final clause illustrates the assumptions the landowners made regarding future zoning conditions in the Pike Creek Valley.[13]

The prior action referred to is the one mentioned above in which the Superior Court issued its opinion finding that the 130-acre set-aside for an 18-hole golf course

---

[12] *Id*. at 216.
[13] *Id*. (internal citation omitted).

remained a valid and binding restriction. The Superior Court granted summary judgment to the County. This appeal followed.

12. This Court reviews a grant of summary judgment *de novo* "to determine whether, viewing the facts in the light most favorable to the nonmoving party, the moving party has demonstrated that there are no material issues of fact in dispute and that the moving party is entitled to judgment as a matter of law."[14] "Questions of law, including the interpretation of statutes, are also reviewed *de novo*."[15]

13. PCRS makes two claims on appeal. The first is that the Superior Court erred in finding that the UDC, if applied to its property, did not alter the restrictions in violation of Section 1.150. We reject this claim and find that the Superior Court's ruling on this issue should be affirmed for the reasons given by the Superior Court in its opinion and order.

14. PCRS's second claim is that the Superior Court committed reversible error by failing to address "multiple, dispositive arguments capable of establishing PCRS's claims for relief[.]"[16] PCRS sets forth four such arguments. The first is that Sections 40.01.300D1 and 40.01.300D2 of the UDC "each create a legislative carve-out which protects the Agreement from the application of the UDC to the PCRS

[14] *Homeland Ins. Co. of N.Y. v. CorVel Corp.*, 197 A.3d 1042, 1046 (Del. 2018) (en banc).
[15] *City of Wilm. v. Nationwide Ins. Co.*, 154 A.3d 1124, 1127 (Del. 2017).
[16] Appellant's Op. Br. at 30.

Property."[17]  Section 40.01.300D1 provides that "[t]he repeal of prior ordinances, resolutions, rules and regulations, provided for in the ordinance adopting this Chapter, shall not affect any act done . . . ."[18]  Section 40.01.300D2 provides that "[a]ll the provisions of ordinances, resolutions, rules and regulations repealed by the ordinance adopting this Chapter shall be deemed to have remained in force from the time when they began to take effect, so far as they may continue to apply . . . ."[19]  PCRS argues that the County approved the restrictions by ordinance, and that under these provisions, the UDC cannot adversely affect the Agreement and PCRS's alleged right to construct new units within the 5,454 cap.  However, the Superior Court's finding, which we affirm, that the UDC does not alter the restrictions, disposes of this argument.  Since the UDC does not alter the restrictions, there is no conflict between the restrictions and the UDC.  They have independent effect upon the PCRS parcel.  Moreover, the record does not support PCRS's contention that the County approved the restrictions by ordinance.  There is no such ordinance in the record.

15.  The second and third arguments in PCRS's second claim are that (1) PCRS's plan to build 224 dwelling units satisfies the County Comprehensive Development Plan (the "Plan") and that (2) the ordinance adopting the current Plan

---

[17]  *Id*. at 31.
[18]  New Castle Cty. C. § 40.01.300D1.
[19]  New Castle Cty. C. § 40.01.300D2.

repealed any sections of the UDC which are more restrictive than or inconsistent with the Agreement. The County's current Plan was last updated on April 24, 2012. The Plan's legal concept map designates PCRS's property as "low density," which permits 1-3 dwelling units per acre.[20] Under the Plan, PCRS argues, it can build between 173 dwelling units (1 per acre) and 519 units (3 per acre) on its 179.28-acre parcel. In addition, the ordinance adopting the Plan provides that "[a]ll ordinances or parts of ordinances and all resolutions or parts of resolutions that may be in conflict herewith are hereby repealed . . . ."[21] From this, PCRS argues that any provision in the UDC which interferes with the building of 224 dwelling units on the PCRS parcel is repealed by the adoption of the updated Plan. It uses, as an example of an allegedly repealed provision, the UDC regulation which states that a golf course cannot serve as community area open space for purposes of calculating density.

16. The County first argues in response that PCRS's Plan arguments were not fairly presented to the Superior Court and are waived. The Plan arguments were not included in PCRS's opening brief in support of its motion for summary judgment. They first appear in its reply brief in support of its motion. The parties briefly

---

[20] PCRS's property currently has a Suburban zoning designation 1.3 to 1.5 units per acre.
[21] A0414.

discussed the Plan issue at oral argument on the parties' cross-motions for summary judgment. However, even if the Plan arguments are reviewed *de novo*, they fail.

17. A Comprehensive Development Plan is adopted to "guide the future development and growth" of the County.[22] County Code Section 28.01.003 governs the County's Comprehensive Development Plan. The format of the April 24, 2012 ordinance adopting the updated Comprehensive Development Plan makes it clear that the County recognized the subsections of 28.01.003, which remain part of the code. Section 28.01.003C states:

> The adoption of the comprehensive development plan shall have the force and effect set forth in 9 *Del. C.* § 101 et. seq. (Counties); provided that, in accordance with 9 *Del. C.* § 2659 (Legal status of comprehensive plan), the land use concept map which forms a part the comprehensive development plan shall have the force of law as to all future rezoning and shall not be regarded as changing any existing zoning district or classification or the zoning and other land development regulations applicable thereto, unless and until the County Council shall adopt a specific ordinance accomplishing such change.[23]

Under this provision, the adoption of the updated Plan was not intended to change any existing development regulations, which would include regulations in the UDC, including the regulation that the space occupied by golf courses cannot be used to satisfy community area open space requirements, unless and until the County

---

[22] 9 *Del. C.* § 2653(a)(1).
[23] New Castle Cty. C. § 28.01.003C.

Council adopts a specific ordinance changing such developmental regulations. It appears from the record that no such change relevant to a regulation affecting PCRS's parcel has been adopted. The regulation that golf courses cannot satisfy community area open space requirements, therefore, continues to apply to PCRS's parcel. Section 28.01.003E also provides that "[t]he plan is not a decision of specific land use proposals or a zoning map and ordinances. Rather the plan sets the stage and direction for changing the development codes and making land use and development decisions."[24] It appears clear to us from these sections that the adoption of an updated Plan does not, in and of itself, create conflicts between the UDC and the Plan. Any changes to the UDC brought on by the adoption of an updated Comprehensive Plan are to be made as part of a process, culminating in County approval of such a change. PCRS's contention that any UDC regulation which applies to its parcel was repealed by implication by the adoption of an updated Comprehensive Plan must be rejected.

18. PCRS's fourth and final argument in its second claim is that "The County Must Accept the Benefits and the Burdens."[25] By this PCRS seems to mean that the County has accepted the benefits of the Agreement, such as the 130-acre set-aside for a golf course, but seeks to reject the burdens of the Agreement, such as the

---

[24] New Castle Cty. C. § 28.01.003E.
[25] Appellant's Op. Br. at 36.

provision that up to 5,454 dwelling units can be constructed. This argument seems to us to be a rehash of the arguments that Paragraph 9 of the Agreement gives PCRS the right to build 224 dwelling units on its parcel despite UDC regulations which do not permit that number and that under Paragraph 16 the County may not impose regulations which are more restrictive than the restrictions in the Agreement. As discussed above, we agree with the Superior Court's conclusion that the Agreement and the County's UDC regulations act upon the property independently of each other, and the one that is more restrictive governs. Nothing in this record persuades us that the County has engaged in any conduct which would prevent it from applying the UDC to the PCRS parcel.[26]

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED.

BY THE COURT:

/s/ James T. Vaughn, Jr.
JUSTICE

---

[26] In its fourth and final argument, PCRS also briefly argues in two sentences that a result which does not allow the building of the remaining units under the 5,454 cap "would render Article 15 meaningless in violation of Delaware law." (Op. Brief, page 39). Article 15 provides, in pertinent part, that "The duration of this agreement shall be for the longer term of two periods, i.e., a period of ten (10) years or until the last dwelling unit is constructed on the SUBJECT ACREAGE within the permissible limits set forth in this agreement." This point was not ruled upon by the Superior Court and we see no need to discuss it here, other than to note that we do not necessarily agree that the result in this case renders Article 15 meaningless.